**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

|  |  |
|---|---|
| BRAYAN OCASIO,<br>    *Plaintiff*,<br><br>    v.<br><br>LIEUTENANT TORRES, *et al*,<br>    *Defendant.* | No. 3:23-cv-01277 (VAB) |

**RULING AND ORDER ON MOTION FOR SUMMARY JUDGMENT**

Mr. Brayan Ocasio ("Plaintiff" or "Mr. Ocasio") brings three claims: (1) an Eighth Amendment failure to protect claim against Lieutenant Torres ("Mr. Torres"); (2) an Eighth Amendment failure to protect claim against Correctional Officer Salgado ("Mr. Salgado"); and (3) a First Amendment retaliation claim against Mr. Torres. *See* Am. Compl., ECF No. 44 ("Compl.").

Mr. Torres and Mr. Salgado (collectively "Defendants") have filed a motion for summary judgment as to the claims against them. Mot. for Summ. J., ECF No. 58 ("Mot.").

For the following reasons, the Defendants' motion for summary judgment is

**GRANTED**.

## I.      FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

During the relevant time period, Mr. Ocasio lived at the Cheshire Correctional Institution ("Cheshire"). Statement of Material Facts ¶ 1, ECF No. 58-2 ("Defs.' SMF"); Statement of Material Facts ¶ 1, ECF No. 67-1 ("Pl.'s SMF"). Mr. Ocasio's claims against Mr. Torres and Mr. Salgado arise from incidents that occurred on August 12, 2023, and August 13, 2023, at which time Mr. Torres was a Lieutenant at Cheshire and Mr. Salgado was a correctional officer

assigned to Cheshire's Restrictive Housing Unit ("RHU"). Defs.' SMF ¶¶ 3, 19, 22; Pl.'s SMF ¶¶ 3, 19, 22. Before August 2023, Mr. Ocasio had allegedly never spoken to or interacted with either Mr. Torres or Mr. Salgado. Defs.' SMF ¶¶ 21, 23; Pl.'s SMF ¶¶ 21, 23.

On August 12, 2023, Mr. Ocasio lived in Cheshire's South Block 2 ("SB2"), a general population housing unit containing approximately 100 inmates, with two inmates housed per cell. Defs.' SMF ¶¶ 8–9; Pl.'s SMF ¶¶ 8–9. During recreation in SB2, inmates could allegedly freely walk in and out of their cells without a correctional staff opening their cell door. Defs.' SMF ¶ 10; Pl.'s SMF ¶ 10.

In Cheshire's RHU, inmates are allegedly monitored more closely and their movements are allegedly more restricted than in general population. Defs.' SMF ¶ 11; Pl.'s SMF ¶ 11. RHU inmates are housed alone, allegedly cannot enter or exit their cells without staff opening their doors, and are allegedly escorted by staff when outside of their cells. Defs.' SMF ¶ 12; Pl.'s SMF ¶ 12. Inmates in the RHU are allegedly afforded two one-hour indoor recreation periods per day and may voluntarily decline to attend. Defs.' SMF ¶ 13; Pl.'s SMF ¶ 13. An officer is stationed in a "bubble" that is attached to and has visibility into the room in which recreation periods take place. Defs.' SMF ¶ 14; Pl.'s SMF ¶ 14. No more than two inmates attend recreation together in the RHU, and RHU staff determine which inmates attend recreation together, ensuring that two inmates subject to a "keep separate" order do not recreate together. Defs.' SMF ¶¶ 15–16; Pl.'s SMF ¶¶ 15–16.

At all relevant times, including in August 2023, Cheshire did not house the Department of Correction's ("DOC") Security Risk Group ("SRG") program, DOC's gang program, nor inmates formally designated as SRG members. Defs.' SMF ¶ 7; Pl.'s SMF ¶ 7.[1] Each housing

---

[1] Mr. Ocasio notes that while Cheshire did not house these specific programs or members, this does not mean that certain Cheshire inmates were not gang-affiliated in practice. Pl.'s SMF ¶ 7.

unit at Cheshire, including SB2 and the RHU, had a Unit Manager who oversaw the unit. Defs.' SMF ¶ 17; Pl.'s SMF ¶ 17. In August 2023, neither Mr. Torres nor Mr. Salgado served as the Unit Manager of SB2 or the RHU. Defs.' SMF ¶ 18; Pl.'s SMF ¶ 18.

Approximately two weeks before August 12, 2023, while housed in SB2, Mr. Ocasio allegedly began receiving threats from inmates in SB2 who were allegedly known to be members or associates of the "Bloods" gang. Defs.' SMF ¶ 24; Pl.'s SMF ¶¶ 24, 89–91. These threats allegedly included threats to assault Mr. Ocasio in his cell or in blind spots during recreation periods. Pl.'s SMF ¶ 91. Mr. Ocasio allegedly reported his safety concerns to multiple correctional officers, who allegedly told him there was nothing they could do and allegedly directed him to submit a written request to his Unit Manager, Captain Blackstock. Pl.'s SMF ¶¶ 92–93. Mr. Ocasio allegedly submitted a written request to Captain Blackstock reporting his safety concerns, but allegedly did not receive a response. *Id.* Mr. Ocasio allegedly did not know the names of the inmates threatening him and allegedly possibly knew only one inmate's nickname. Defs.' SMF ¶ 26; Pl.'s SMF ¶ 26. Mr. Ocasio alleges that while gang-affiliated inmates could allegedly hide their affiliation from DOC staff to avoid placement in the DOC's SRG program, gang affiliations were allegedly discussed openly among inmates. Pl.'s SMF ¶ 25. Thus, Mr. Ocasio alleges that corrections officers on patrol should have been aware of gang members' affiliations. *Id.*

On the afternoon of August 12, 2023, Mr. Ocasio allegedly called his family from SB2 to inform them he was receiving these threats. Defs.' SMF ¶ 27; Pl.'s SMF ¶ 27. At approximately 5:25 p.m., a call was allegedly routed to Cheshire's Lieutenant's office, where Mr. Torres allegedly answered. Defs.' SMF ¶ 28; Pl.'s SMF ¶ 28. The caller allegedly identified himself as Mr. Ocasio's stepfather. *Id.* The caller allegedly informed Mr. Torres that Mr. Ocasio was being

threatened by gang members in SB2. Defs.' SMF ¶ 29; Pl.'s SMF ¶ 29. During the call, Mr. Torres allegedly gathered Mr. Ocasio's name, inmate number, and housing location. Defs.' SMF ¶ 30; Pl.'s SMF ¶ 30. Following the call, Mr. Torres allegedly arranged for Mr. Ocasio to be brought to Cheshire's medical unit, rather than to the Lieutenant's office, to "lessen any chance that [Mr. Ocasio] is viewed as a snitch," which could make him a target. Defs.' SMF ¶¶ 31–33; Pl.'s SMF ¶¶ 31–33. Mr. Ocasio allegedly agreed that it was "better for Torres to call [him] down to medical on August 12, 2023, rather than calling [him] to the [L]ieutenant's office." Defs.' SMF ¶ 34; Pl.'s SMF ¶ 34.

Mr. Torres allegedly spoke with Mr. Ocasio in the medical unit, informed him of the call from his family, and asked him about the threats in order to further investigate. Defs.' SMF ¶ 35; Pl.'s SMF ¶ 35.[2] As the conversation progressed, Mr. Ocasio allegedly told Mr. Torres that "Blood gang members are mad" and were "going to jump [him] in the cell or . . . hurt [him] somehow" if he did not get out of SB2. Defs.' SMF ¶ 37; Pl.'s SMF ¶ 37. Mr. Ocasio allegedly told Mr. Torres there were about thirty to forty Blood members in SB2. Defs.' SMF ¶ 38; Pl.'s SMF ¶ 38. Mr. Torres allegedly told Mr. Ocasio that if he could not be more specific about who was making threats, Mr. Torres would have to move Mr. Ocasio for his safety. Defs.' SMF ¶ 40; Pl.'s SMF ¶ 40.[3]

---

[2] The parties dispute the substance of what Mr. Ocasio conveyed to Mr. Torres during this meeting. The Defendants contend that Mr. Ocasio initially indicated only that he "had problems" in SB2 and was reluctant to provide specific details. Defs.' SMF ¶ 36. Mr. Ocasio disputes this characterization and states that he specifically informed Mr. Torres that Blood gang members were threatening him because other inmates falsely believed he had snitched on his cellmate regarding contraband. Pl.'s SMF ¶ 36. Mr. Ocasio also states that Mr. Torres appeared visibly angry about having received the call from Mr. Ocasio's stepfather. *Id.*

[3] The Defendants assert that Mr. Ocasio did not specifically identify any inmate by name. Defs.' SMF ¶ 39. Mr. Ocasio disputes this and states that he described one inmate known to him as "Red" and confirmed that inmate's identity through a photograph shown to him when he was escorted to the medical unit. Pl.'s SMF ¶ 39.

4

Mr. Torres allegedly then informed Mr. Ocasio that he would be moved to Cheshire's RHU. Defs.' SMF ¶ 41; Pl.'s SMF ¶ 41.[4] When Mr. Ocasio allegedly expressed disagreement with the housing transfer, Mr. Torres allegedly issued Mr. Ocasio a Class A disciplinary report ("DR") for "Refusing Housing," allegedly explaining that there is "no 'fearing for your safety disciplinary report'" and that he could not place Mr. Ocasio in the RHU "pending an investigation" or without issuing a DR. Defs.' SMF ¶ 42; Pl.'s SMF ¶ 42, 98–99.

On the evening of August 12, 2023, following his receipt of the DR, Mr. Ocasio was allegedly brought to Cheshire's RHU and placed in a cell without a cellmate. Defs.' SMF ¶ 48; Pl.'s SMF ¶ 48. On August 13, 2023, Mr. Ocasio allegedly declined to attend his morning recreation period. Defs.' SMF ¶ 51; Pl.'s SMF ¶ 51. He allegedly attended his afternoon recreation period, which took place from approximately 5:00 p.m. to 6:00 p.m. in the RHU dayroom. Defs.' SMF ¶ 52; Pl.'s SMF ¶ 52. Mr. Ocasio was allegedly placed in the dayroom with one other inmate, Mr. Martinez, whom Mr. Ocasio had allegedly never previously seen or encountered. Defs.' SMF ¶¶ 53–54; Pl.'s SMF ¶¶ 53–54.

Mr. Ocasio allegedly did not request to be separated from Mr. Martinez at any time before or during their time in the dayroom together. Defs.' SMF ¶ 55; Pl.'s SMF ¶ 55. During the afternoon recreation period, Mr. Ocasio and Mr. Martinez allegedly conversed without any apparent conflict. Defs.' SMF ¶ 56; Pl.'s SMF ¶ 56 (disputing that the conversation was "amicable" and noting that the dayroom is video-recorded but not audio-recorded, and therefore

---

[4] The parties dispute the circumstances of this decision. The Defendants contend that Mr. Torres was not in charge of RHU housing assignments and that the RHU transfer was a necessary outcome of the available options. Defs.' SMF ¶ 20. Mr. Ocasio contends that Mr. Torres possessed the authority to place inmates in the RHU through the disciplinary process, that Mr. Ocasio specifically requested transfer to an alternative and safer location such as South Block 4, and that Mr. Torres refused to consider an alternative. Pl.'s SMF ¶¶ 20, 95–96. Mr. Ocasio also contends that Mr. Torres's actions were motivated in part by anger that Mr. Ocasio's family had contacted him. Pl.'s SMF ¶ 100.

the tenor of the conversation could not be verified). Mr. Salgado allegedly observed the dayroom during this recreation period and allegedly witnessed nothing indicating any issues between the two inmates. Defs.' SMF ¶ 57; Pl.'s SMF ¶ 57 (admitted).

At the end of the one-hour recreation period, Mr. Salgado allegedly went to the first of two doors at the entrance to the RHU dayroom and instructed Mr. Ocasio to enter the sallyport to be secured in handcuffs and escorted back to his cell first. As Mr. Ocasio was walking out of the dayroom and towards the sallyport, Mr. Martinez allegedly assaulted him by jumping him from the side and striking him. Defs.' SMF ¶ 58; Pl.'s SMF ¶ 58. Mr. Ocasio allegedly fell to the floor and Mr. Martinez allegedly delivered additional strikes to his head and body for approximately 23 seconds. Defs.' SMF ¶ 59; Pl.'s SMF ¶ 59. Mr. Ocasio allegedly did not expect the assault and stated that he "ha[d] no idea why [it] happened." Defs.' SMF ¶ 60; Pl.'s SMF ¶ 60.

Officer Salgado was allegedly the only officer present when the assault began, and immediately allegedly called a "code blue" over the radio upon observing it. Defs.' SMF ¶ 61; Pl.'s SMF ¶ 61. A "code blue" signifies an inmate-on-inmate assault and prompts staff from other areas of the facility to respond, and it is protocol to wait for responding staff before intervening. Defs.' SMF ¶¶ 62–63; Pl.'s SMF ¶¶ 62–63. Within thirty seconds of the onset of the assault, numerous staff members allegedly responded to the RHU dayroom, at which point Mr. Martinez allegedly retreated from Mr. Ocasio and both inmates were separated and secured. Defs.' SMF ¶¶ 64–65; Pl.'s SMF ¶¶ 64–65. Mr. Ocasio was allegedly escorted back to his cell. Defs.' SMF ¶ 66; Pl.'s SMF ¶ 66. Mr. Ocasio alleges that Officer Salgado failed to intervene during the assault or take any steps to protect him beforehand. Pl.'s SMF ¶ 103.

On August 16, 2023, Mr. Ocasio allegedly pled guilty to the "Refusing Housing" DR by signing it under a section stating: "I hereby plead guilty to the charge contained in this

6

disciplinary report. I voluntarily enter this plea and understand that my plea bars an appeal."

Defs.' SMF ¶¶ 45–46; Pl.'s SMF ¶¶ 45–46. Mr. Ocasio alleges, however, that he entered the

guilty plea under duress, motivated by his desire to leave the dangerous conditions of the RHU.

Pl.'s SMF ¶ 45.

### B. Procedural History

On August 25, 2023, Mr. Ocasio filed an Inmate Request Form with the DOC as part of

the DOC's administrative remedies procedure. Pl.'s SMF ¶ 104.

On September 26, 2023, Mr. Ocasio filed a Level 1 grievance with the DOC regarding

the events of August 12 and August 13, 2023. Defs.' SMF ¶ 82; Pl.'s SMF ¶ 82.

On September 28, 2023, Mr. Ocasio filed a Complaint against Mr. Torres. Compl., ECF

No. 1.

On November 8, 2023, Mr. Ocasio's Level 1 grievance was rejected because it was not

filed within thirty calendar days of the occurrence or discovery of the cause of the grievance, as

required by administrative procedures. Defs.' SMF ¶ 87; Pl.'s SMF ¶ 87.

On December 26, 2023, the Court issued an Initial Review Order in the case dismissing

the claims against Mr. Torres in his official capacity. Initial Review Order, ECF No. 22. The

Court allowed Mr. Ocasio to file an Amended Complaint to correct the deficiencies identified in

the Initial Review Order. *Id.*

On January 16, 2024, Mr. Ocasio filed a motion to appoint counsel. Mot. to Appoint

Counsel, ECF No. 25. On January 18, 2024, the Court granted the motion to appoint counsel.

Order, ECF No. 26. On January 19, 2024, Mr. Ocasio's counsel filed a motion for relief from

appointment, ECF No. 29, which the Court granted on January 22, 2024, Order, ECF No. 30.

On March 1, 2024, Mr. Ocasio moved once more to appoint counsel. Mot. to Appoint Counsel, ECF No. 32. On March 5, 2024, the Court granted the motion to appoint counsel. Order, ECF No. 33. On March 20, 2024, Mr. Keith T. Trumbo and Mr. Dennis M. Durao entered notices of appearance on behalf of Mr. Ocasio. Notice of Appearance, ECF No. 37; Notice of Appearance, ECF No. 38.

On June 18, 2024, Mr. Ocasio moved to amend his Complaint, Mot. to Amend, ECF No. 42, which the Court granted on July 15, 2024, Order, ECF No. 43. On July 16, 2024, Mr. Ocasio filed an Amended Complaint against Mr. Torres and Mr. Salgado. Am. Compl., ECF No. 44 ("Compl."). On October 30, 2024, the Defendants filed their Answer, ECF No. 50 ("Answer").

On June 30, 2025, the Defendants filed a motion for summary judgment. Mot. for Summ. J., ECF No. 58 ("Mot.").

On September 17, 2025, Mr. Ocasio filed a memorandum in opposition to the Defendants' motion for summary judgment. Mem. in Opp., ECF No. 67 ("Mem. in Opp.").

On September 26, 2025, the Defendants filed a response to Mr. Ocasio's memorandum in opposition. Resp., ECF No. 68 ("Resp.").

## II.     STANDARD OF REVIEW

A court will grant a motion for summary judgment if the record shows no genuine issue as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party bears the initial burden of establishing the absence of a genuine dispute of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). The non-moving party may defeat the motion by producing sufficient evidence to establish that there is a genuine issue of material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise

properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Id.* at 247–48.

"[T]he substantive law will identify which facts are material." *Id.* at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Id.*; *see Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) ("[M]ateriality runs to whether the dispute matters, i.e., whether it concerns facts that can affect the outcome under the applicable substantive law." (citing *Anderson*, 477 U.S. at 248)).

"The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson*, 477 U.S. at 250. When a motion for summary judgment is supported by documentary evidence and sworn affidavits and "demonstrates the absence of a genuine issue of material fact," the non-moving party must do more than vaguely assert the existence of some unspecified disputed material facts or "rely on conclusory allegations or unsubstantiated speculation." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (internal quotation marks omitted).

The party opposing the motion for summary judgment "must come forward with specific evidence demonstrating the existence of a genuine dispute of material fact." *Id.* (internal quotation marks omitted). "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 250 (citing *Dombrowski v. Eastland*, 387 U.S. 82, 87 (1967); and *First Nat'l Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 290 (1968)).

A court must view any inferences drawn from the facts in the light most favorable to the party opposing the summary judgment motion. *See Dufort v. City of New York*, 874 F.3d 338, 343, 347 (2d Cir. 2017) ("On a motion for summary judgment, the court must 'resolve all ambiguities and draw all permissible factual inferences in favor of the party against whom summary judgment is sought.'"). A court will not draw an inference of a genuine dispute of material fact from conclusory allegations or denials, *see Brown v. Eli Lilly & Co.*, 654 F.3d 347, 358 (2d Cir. 2011), and will grant summary judgment only "if, under the governing law, there can be but one reasonable conclusion as to the verdict," *Anderson*, 477 U.S. at 250.

## III.   DISCUSSION

Mr. Ocasio brings three claims in this action: (1) an Eighth Amendment failure to protect claim against Mr. Torres; (2) an Eighth Amendment failure to protect claim against Mr. Salgado; and (3) a First Amendment retaliation claim against Mr. Torres. *See* Am. Compl., ECF No. 44 ("Compl.").

The Defendants raise four arguments in support of summary judgment on all claims: first, Mr. Ocasio failed to exhaust his administrative remedies as required under the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a); second, Mr. Ocasio cannot establish the merits of his Eighth Amendment failure to protect claims; third, Mr. Ocasio cannot establish the merits of his First Amendment retaliation claim; and fourth, Mr. Torres and Mr. Salgado are entitled to qualified immunity.

The Court's inquiry begins, and ends, with the PLRA's exhaustion requirement.

### A.  The PLRA Exhaustion Requirement

The Prison Litigation Reform Act of 1995 provides that "[n]o action shall be brought with respect to prison conditions . . . by a prisoner confined in any jail, prison, or other

10

correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C.

§ 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life,"

*Porter v. Nussle*, 534 U.S. 516, 532 (2002), regardless of whether the inmate may obtain the

specific relief he desires through the administrative process, *Booth v. Churner*, 532 U.S. 731, 738

(2001). Additionally, plaintiffs are required to exhaust their administrative remedies for each

claim asserted in federal court; any "unexhausted claim" within a complaint is subject to

dismissal. *Ortiz v. McBride*, 380 F.3d 649, 657–58 (2d Cir. 2004).

The PLRA requires "proper exhaustion." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). This

means that the inmate must comply with all "procedural rules," including filing deadlines,

required by the particular prison's grievance system. *Id.* at 90–91. "[U]ntimely or otherwise

procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's

exhaustion requirement." *Ruggiero v. County of Orange*, 467 F.3d 170, 176 (2d Cir. 2006)

(citing *Woodford*, 548 U.S. at 83–84). And "grievances must [] be fully pursued prior to filing a

complaint in federal court." *Neal v. Goord*, 267 F.3d 116, 122 (2d Cir. 2001).

The exhaustion requirement may be excused, however, when the remedy is not available

in practice even if it is "officially on the books." *Ross v. Blake*, 578 U.S. 632, 642–43 (2016).

The Supreme Court has identified three types of circumstances in which an administrative

procedure is unavailable and, therefore, need not be exhausted: (1) "when (despite what

regulations or guidance materials may promise) it operates as a simple dead end—with officers

unable or consistently unwilling to provide any relief to aggrieved inmates;" (2) when a

procedure is "so opaque that it becomes, practically speaking, incapable of use;" and (3) "when

prison administrators thwart inmates from taking advantage of a grievance process through

machination, misrepresentation, or intimidation." *Id.* at 643–44. "Whether an administrative

11

remedy was available to a prisoner in a particular prison or prison system is ultimately a question of law, even when it contains factual elements." *Hubbs v. Suffolk Cnty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir. 2015).

Failure to exhaust administrative remedies is an affirmative defense. *See Jones v. Bock*, 549 U.S. 199, 216 (2007). Thus, defendants "bear the initial burden of establishing . . . that a grievance process exists and applies to the underlying dispute." *Hubbs*, 788 F.3d at 59.

### B.  Administrative Directive 9.6

"[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion." *Bock*, 549 U. S. at 218. A plaintiff in DOC custody who asserts claims based on correctional staff's deliberate indifference to his health and safety due to unconstitutional conditions of confinement generally must exhaust his remedies through the grievance procedures set forth in DOC Administrative Directive 9.6 ("A.D. 9.6"); *see also Riles v. Buchanan*, 656 F. App'x 577, 579 (2d Cir. 2016) (summary order) ("The Connecticut Department of Correction ('DOC') requires inmates to submit grievances in accordance with Administrative Directive 9.6 ('A.D. 9.6')").

Before an inmate can file a grievance under A.D. 9.6, he must first seek "informal resolution." A.D. 9.6 § 6.a.i. The inmate must attempt to "resolve the issue verbally" and, if this effort is unsuccessful, must "submit a written request via form CN 9601." *Id.*

If these informal resolution steps are unsuccessful, the inmate may file a Level 1 grievance using form CN 9602, which must be submitted within thirty calendar days after the occurrence or discovery of the cause of the grievance. A.D. 9.6 § 6.a.ii.4. The grievance must include documentation of the inmate's written request to resolve the matter informally or an explanation of why such documentation is not attached. *Id.* at § 6.a.ii.2. The Unit Administrator

is required to respond in writing to a Level 1 grievance within thirty business days of receipt of the grievance. A.D. 9.6 § 6.b.i.3.

An inmate may appeal to Level 2 if the Unit Administrator either denies a Level 1 grievance or fails to respond to the grievance in a timely manner. A.D. 9.6 § 6.b.ii. When the Administrator denies a Level 1 grievance, the Level 2 appeal must be filed within five calendar days of the inmate's receipt of the Administrator's decision. *Id.* at § 6.b.ii.1. When the Administrator fails to respond to a Level 1 grievance in a timely manner, the Level 2 appeal must be filed within sixty-five days of the date the Level 1 grievance was filed. *Id.* at § 6.b.ii.2.

Level 3 appeals are restricted to appeals of Level 2 decisions that challenge department policy or the integrity of the grievance procedure, or appeals to which there has been an untimely response by the District Administrator. A.D. 9.6 § 6.b.iii.1. An inmate must file a Level 3 grievance using form CN 9605 within five calendar days of the Level 2 denial, or, if the Level 3 form was submitted "as a result of an inmate not receiving a response to a CN 9604, Inmate Grievance Appeal Form – Level 2 within 30 business days, [it] must be filed within 65 calendar days of filing the CN 9604, Inmate Grievance Appeal Form – Level 2." A.D. 9.6 § 6.b.iii.2.

### C.  Mr. Ocasio's Compliance with the Exhaustion Requirement

The Defendants argue that Mr. Ocasio failed to exhaust his administrative remedies for three reasons.

First, Mr. Ocasio filed his Level 1 grievance more than thirty days after August 12 and August 13, 2023, and was therefore untimely and procedurally defective. Mot. at 6.

Second, Mr. Ocasio commenced this suit only days after filing the Level 1 grievance, and before he received any response to it. *Id.* at 6–7.

13

Third, Mr. Ocasio failed to raise any complaints concerning his First Amendment retaliation claim against Mr. Torres or his Eighth Amendment claim against Mr. Salgado, and therefore failed to "put prison officials on sufficient notice of his complaints." *Id.* at 7–8.

Mr. Ocasio argues that he sufficiently exhausted his remedies because he first attempted to informally resolve his complaint and later filed a formal grievance on August 25, 2023, to which he received no response from DOC. Mem. in Opp. at 6.

Next, Mr. Ocasio argues that even if he did not formally exhaust his administrative remedies, it is because "the formal grievance process was unavailable to him within the meaning of § 1997e(a)," since he filed his September 26, 2023 grievance only after receiving no response to his August 25, 2023 grievance. *Id.* at 7–8. Thus, Mr. Ocasio argues that "the untimeliness was caused by DOC's failure to meet its own deadline," creating "precisely the sort of 'dead end'" that permits a court to excuse the PLRA's exhaustion requirements.

Finally, Mr. Ocasio argues that the Defendants are estopped from asserting the exhaustion defense because "their own conduct prevented completion of the grievance process," and "courts in this Circuit have continued to apply estoppel where prison officials interfered with an inmate's ability to exhaust remedies through formal procedures." *Id.* at 9–10.

In response, the Defendants argue that "it is black-letter law in the Second Circuit that 'informal' attempts to exhaust are insufficient under the PLRA." Resp. at 2–3. Rather, in order to properly exhaust his claim, Mr. Ocasio had to have complied with "*all* steps set forth in Directive 9.6, including deadlines and utilization of each step of the administrative appeal process." *Id.* at 3 (citing *Urbanski v. Dep't of Corr.*, 2019 U.S. Dist. LEXIS 210391, at *14 (D. Conn. Dec. 5, 2019)). In addition, the administrative exhaustion procedures were available to Mr. Ocasio, since A.D. 9.6 "provide[s] an available remedy when a prisoner does not receive a timely response to

14

an informal resolution." *Id.*  Because Mr. Ocasio's failure to exhaust was his alone, the

Defendants argue that they are not estopped from asserting the exhaustion defense. *Id.* at 3–5.

The Court agrees.

There is some conflict as to whether Mr. Ocasio's August 25, 2023 grievance concerned

the events underlying this lawsuit. *See* Pl.'s SMF ¶ 81–82 (Mr. Ocasio admits that he has "filed

at least two administrative remedies or grievances during his time within DOC," and that "the

sole grievance that [he] filed pertaining to the August 2023 incidents that gave rise to his instant

claims was a Level-1 grievance . . . which [he] filed at Cheshire on September 26, 2023"); *see*

*also id.* ¶ 104 (stating that Mr. Ocasio filed an Inmate Request Form on August 25, 2023 "to

report the events underlying this lawsuit"); *Id.* ¶ 88 (Mr. Ocasio confirmed that "there were no

other grievances that he contemplated filing regarding the August 2023 incidents that gave rise to

his instant claims."). But this conflict is not material, as there is no dispute that Mr. Ocasio failed

to comply with the remaining exhaustion requirements outlined in A.D. 9.6 with respect to either

the August 25, 2023 or the September 26, 2023 Level 1 grievances. *See, e.g.,* Pl.'s SMF ¶ 82

(admitting that "[t]he sole grievance that Plaintiff filed pertaining to the August 2023 incidents

that give rise to his instant claims was a Level-1 grievance, Grievance #125-24-093, which

Plaintiff filed at Cheshire on September 26, 2023" (citations omitted)); *id.* at ¶ 84 (admitting that

"Plaintiff filed Grievance #125-24-093 on the same day that he filed his Complaint in this case.")

(citations omitted); *id.* at ¶ 88 (admitting that "there were no other grievances that he

contemplated filing regarding the August 2023 incidents that give rise to his instant claims.")

(citation omitted).

An inmate's failure to exhaust administrative remedies is only excusable if administrative

remedies are, in fact, unavailable. *See Ross*, 578 U.S. at 642–43 ("[T]he PLRA contains its own,

textual exception to mandatory exhaustion. Under § 1997e(a), the exhaustion requirement hinges on the 'availability' of administrative remedies.") (internal quotation marks omitted); *see also id.* ("The PLRA's history (just like its text) thus refutes a 'special circumstances' exception to its rule of exhaustion."). Mr. Ocasio has not made any allegations, nor provided any evidence, to support his contention that the procedures laid out in A.D. 9.6 were "unavailable" to him. Instead, he argues that DOC's failure to respond to his August 25, 2023 grievance made an "appeal" of that grievance "impossible." Mem. in Opp. at 8–9.

A.D. 9.6 describes the proper appeals procedure, however, for when an inmate does not receive a response to his Level 1 grievance. Specifically, an inmate who does not receive a response from DOC within thirty business days of receipt of his Level 1 grievance may appeal to Level 2 within sixty-five days of the date on which the Level 1 grievance was filed. A.D. 9.6 §§ 6.b.i.3, 6.b.ii.2. And "proper exhaustion" under the PLRA requires the inmate to comply with all "procedural rules," including filing deadlines, required by the particular prison's grievance system. *See Woodford*, 548 U.S. at 100 ("[S]aying that a party may not sue in federal court *until* the party first *pursues* all avenues of administrative review necessarily means that, if the party never pursues all available avenues of administrative review, the person will never be able to sue in federal court.") (emphasis in original). Additionally, for the purposes of Mr. Ocasio's estoppel argument, Mr. Ocasio has failed to provide any evidence to support his contention that the Defendants' "own conduct prevented completion of the grievance process." Mem. in Opp. at 9.

Because Mr. Ocasio did not appeal his grievance through the procedures outlined in A.D. 9.6, which were available to him, Mr. Ocasio failed to exhaust his administrative remedies under the PLRA. Thus, his claims will be dismissed, and the Court need not address the remaining issues raised by the parties. *See Jones*, 549 U.S. at 211 ("There is no question that exhaustion is

16

mandatory under the PLRA and that unexhausted claims cannot be brought in court."); *see also*

*Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) ("Exhaustion is mandatory—unexhausted

claims may not be pursued in federal court.").

Accordingly, the Defendants' motion for summary judgment will be granted.

## IV.    CONCLUSION

For the foregoing reasons, the Defendants' motion for summary judgment is

**GRANTED**.

The Clerk of Court is respectfully directed to enter judgment for the Defendants, and to

close this case.

**SO ORDERED** at New Haven, Connecticut, this 30th day of March, 2026.

/s/ Victor A. Bolden

VICTOR A. BOLDEN

UNITED STATES DISTRICT JUDGE